## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | |
|---|---|
| STEPHEN HUMMEL, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | )    No. 3:10-CV-003 JD |
| ST. JOSEPH COUNTY BOARD | ) |
| OF COMMISSIONERS, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Now before the Court is the plaintiffs' Motion for Preliminary Injunction [DE 82]. Claiming that the St. Joseph County Courthouse in South Bend, Indiana, does not comply with the accessibility requirements of the Americans with Disability Act, the plaintiffs—current litigants in St. Joseph County courts—ask the Court to fashion an injunction that would compel compliance. The County Defendants ask the Court to deny the motion, arguing that the plaintiffs have little likelihood of success on the merits and have not established that a preliminary injunction is necessary to prevent irreparable harm.[1] Though the Court concludes that the plaintiffs may have a reasonable likelihood of success on the merits for purposes of this inquiry, it finds that a preliminary injunction is not warranted in this case because the irreparable harm the County would suffer if required to make substantial renovations to the Courthouse prior to a final disposition on the merits outweighs the irreparable harm the plaintiffs may suffer.

---

[1] Although the initial motion for a preliminary injunction names co-defendant City of South Bend as a target, plaintiffs' counsel clarified at the hearing that plaintiffs are not seeking to preliminarily enjoin the City.

## Background

Victoria Means, Tonia Matney, Stephen Hummel, and Margaret Hummel filed this lawsuit against the St. Joseph County Board of Commissioners, the St. Joseph County Superior Court, and the City of South Bend in January 2010, alleging violations of the ADA in the two St. Joseph County courthouses—the Superior Court in South Bend and a facility in Mishawaka—as well as in the public parking surrounding the buildings. *See* DE 1. The complaint sought damages for the violations, but its main focus was to obtain injunctive relief remedying the alleged violations. In September 2011, the Court partially granted a motion to dismiss by the County, dismissing the plaintiffs' claims for prospective relief against the County for want of standing because none of them had ongoing or imminent litigation in either of the courthouse buildings, and dismissing Means' and Matney's damages claims against the County for failure to state a claim. The plaintiffs subsequently amended their complaint and added additional plaintiffs, some of whom had (and still have, as far as the Court is aware) pending litigation in the courthouses.

The plaintiffs filed their motion for a preliminary injunction on January 25, 2012, and initial briefing was complete by early February. *See* DE 92, 94, 96. On February 9, the Court held a status conference, at which it afforded the parties until May 11 to conduct discovery relative to the motion. *See* DE 97. The Court set an evidentiary hearing for June 22, and each party filed a trial brief in advance of the hearing. *See* DE 108, 109.

At the hearing, the plaintiffs presented four witnesses: County Commissioner Robert Kovach, St. Joseph County Building Engineer John Embrickson, Architect John Werntz, and St. Joseph County Superior Court Chief Judge Michael Scopelitis. The Court then continued the hearing, at the plaintiffs' request, and resumed it on July 27. The plaintiffs called two additional

witnesses, Michael Pawlak, an individual in a wheelchair who testified about his experience being called for jury duty, and plaintiff Karen Brandy-Comer, who has had and will have occasion to visit the Courthouse in a wheelchair. Following the second day of the hearing, the plaintiffs supplemented the record with transcripts of depositions of County Commissioners Dave Thomas [DE 116] and Andy Kostienlney [DE 118], County Auditor Peter H. Mullen [DE 117], Chief Judge Michael Scopelitis, and Building Engineer John Embrickson [DE 120]. After the hearing, the parties submitted their final briefing on the matter, *see* DE 124, 127, 128, which is now ripe for ruling.

The evidence focus primarily on two subjects: the accessibility of the Courthouse under current conditions and the imminent plans for rehabilitation. Regarding the current conditions, testimony of John Embrickson, John Werntz, and others revealed that the primary way that a person in a wheelchair (or otherwise unable to climb steps) would access the Courthouse is as follows. First, she would enter the City-County building (at the southwest corner of the block). She would then take an elevator down to the basement and travel up a ramp (which both Embrickson and Werntz testified was compliant with ADA requirements) through a tunnel from the City-County building to the basement of the Courthouse. From the basement, access to the courtrooms would require a disabled individual to take another elevator.

There are no public bathrooms in the Courthouse that are accessible to individuals in wheelchairs.[2] According to Embrickson, the public restrooms on the first floor of the

---

[2]The County notes in its post-hearing brief that the entire basement courtroom was remodeled several years ago and is completely ADA-compliant, as is the adjacent 1855 Courthouse. There is no evidence that any of these courtrooms are currently made available to individuals with disabilities who are involved in litigation before the Superior Court. As discussed below, however, that is likely to change in the relatively near future.

Courthouse are too small to allow wheelchair access and cannot be made ADA compliant due to the presence of load-bearing walls. There are two restrooms in the basement, but one is reserved for security officers and the other is an inaccessible women's restroom. Thus, to use a restroom, an individual in a wheelchair would need to take the elevator back to the basement and then travel back down the tunnel ramp to the basement of the City-County building, where there is an accessible, ADA-compliant restroom.

In the courtrooms themselves, neither the witness stands nor the jury boxes are accessible to someone in a wheelchair. According to Judge Scopelitis, however, individuals with disabilities who need to testify or serve on a jury would be accommodated, and he was not aware of any complaint that someone was not getting a case efficiently handled because of a disability. While plaintiffs' counsel in this case (who also frequently represents clients in the Superior Courthouse) has complained about the lack of restroom facilities, Judge Scopelitis also testified that extra time is allowed for recess when an individual in a wheelchair is involved in the case, to allow sufficient time for the journey to the restroom. Judge Scopelitis acknowledged that there were inconveniences for individuals with disabilities, but reiterated that he has no knowledge that anyone has been denied access to court services because of their disability.

Two individuals who use wheelchairs testified about their ability to access the Court. Matthew Pawlak was summoned for jury duty in 2006 and had to reach the Courthouse via the route described above—down an elevator, up a ramp that he claims is somewhere between 30 and 50 yards long (though, curiously, this is the only evidence regarding what may be a crucially important issue), and up a small elevator. He noted that the clerk's counters were too high for him to reach, and that he would not have been able to get in the jury box in the courtroom without a great expense of energy. Plaintiff Karen Brandy-Komer also testified that in addition

to desiring to attend hearings in her current litigation, she had recently visited the Courthouse. She entered in the manner described above, and observed that the doorway to the women's restroom in the Courthouse was too narrow and that the witness and jury boxes were not accessible to someone in a wheelchair.

The evidence also showed that the County was beginning to move ahead with a plan of renovation and rehabilitation to the courthouse complex that would eventually create a fully-ADA-accessible civil courtroom in the basement of the courthouse, with adjacent ADA-compliant restrooms. About half of the total necessary funds have been authorized, and more is planned for the future. The first phase of the project involved rehabilitating the old county jail, which sits between the Courthouse and the City-County building, and converting it into criminal courtrooms. The next phase would then involve the renovation of the courtroom in the basement of the Courthouse—which is currently used exclusively for criminal matters—and bringing it into full compliance with current ADA requirements. The restroom currently reserved for security officers is also large enough to be converted into an accessible restroom. Chief Judge Scopelitis testified that it is his expectation that the renovations will be complete, and that there will be a fully ADA-compliant courtroom as well as an ADA-compliant restroom in the basement of the Courthouse by the end of 2013. The parties dispute the reason for the renovation plans—the plaintiffs contend that it is a response to this litigation while the County says the plans have been in the works for some time. The plaintiffs also argue that the Court should not rely on the plans to deny a preliminary injunction because there is no guarantee that the County will allocate the funds necessary to complete the project.[3]

---

[3]In their initial brief, the plaintiffs also argued that recent renovations to the Courthouse did nothing to address the alleged ADA violations and thus violated 28 C.F.R. § 35.151(b)(1),

## Analysis

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citations omitted). "In assessing whether a preliminary injunction is warranted, we must consider whether the party seeking the injunction has demonstrated that '1) it has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if it is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest.'" *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001)). The Court must exercise its discretion to arrive at a decision "based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986).

The analysis involves a so-called sliding scale: "the more likely it is the plaintiff will succeed on the merits, the less balance of irreparable harms need weigh toward its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). The sliding scale approach is not mathematical in nature, rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895-96 (7th Cir. 2001) (quoting *Abbott*

---

which requires certain alterations to existing facilities to meet ADA standards. The plaintiffs appear to have abandoned this argument, however, as they have presented no evidence that the renovations altered the facility "in a manner that affects or could affect the usability of the facility or part of the facility." *Id.*

*Labs.*, 971 F.2d at 12).

### A.  Likelihood of Success on the Merits

The plaintiffs claim that the Courthouse facilities and the services provided there are in violation of Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or by subjected to discrimination by such entity." 42 U.S.C. § 12132.[4]  The defendants have conceded that St. Joseph County and its Board of Commissioners, as well as the St. Joseph Superior Court, are "public entities" covered by Title II, and it is beyond question that the services provided by those entities in the South Bend courthouse are "services, programs, or activities." *Cite.* (Tennessee v. Lane, 541 U.S. 509 (2004)).

To succeed on the merits of a claim under Title II, a plaintiff must establish "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Frame v. City of Arlington*, 575 F.3d 432, 435 (5th Cir. 2009); *Culvahouse v. City of LaPorte*, 679 F. Supp 2d 931, 937 (N.D. Ind. 2009). Discrimination, under both the ADA and the Rehabilitation Act, "may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Washington v. Indiana High Sch. Athletic Ass'n,*

---

[4]The plaintiffs also allege that the Courthouse conditions also violation § 504 of the Rehabilitation Act, but that act prohibits the same or substantially similar conduct as the ADA. *See Wis. Comm. Serv. v. City of Milwaukee*, 465 F.3d 737, 751 (7th Cir. 2006).

*Inc.*, 181 F.3d 840, 847 (7th Cir. 1999). While there is no express accommodation requirement in Title II itself, the implementing regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). To establish discrimination "on the basis of" disability, a plaintiff must "show that, 'but for' his disability, he would have been able to access the services or benefits desired." *Wisconsin Community Services v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006).

There appears to be no real dispute over the first element, that the plaintiffs meet the definition of "qualified individual with a disability" found in 42 U.S.C. § 12131(2). Regarding the second element, the plaintiffs contend that the County has discriminated against them by failing to reasonably accommodate their needs as individuals with disabilities. There also seems to be little dispute at this point that it is *possible* for persons with disabilities to access the courthouse and court services: plaintiff Ms. Karen Brandy-Comer herself testified that she was able to access court services, and Judge Scopelitis testified that judges routinely accommodate attorneys, witnesses, and jurors with disabilities. Judge Scopelitis further indicated that he is not aware of anyone who was ultimately unable to access court services.

But the ADA regulations require more than the mere possibility of physical access. "A violation of Title II, however, does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity." *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) ("If the Courthouse's wheelchair ramps are so steep that they impede a disabled person or if its bathrooms are unfit for the use of a disabled person, then it cannot be said that the

trial is 'readily accessible,' regardless whether the disabled person manages in some fashion to attend the trial."). The regulations, like the statute, provide a general requirement of non-discrimination: "no qualified individual with a disability shall, on the basis of disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.130(a). Among other things, this means that a public entity may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the . . . that is not equal to that afforded others." *Id.* § 35.130(b)(1)(ii).

For facilities, the ADA regulations reiterate the general anti-discrimination requirement, *see* 28 C.F.R. § 35.149, and elaborate the accommodations that public entities are and are not required to make in order to render the facilities—or at least the programs or services—"readily accessible to and usable by individuals with disabilities." For facilities constructed after January 26, 1992, "each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities." *Id.* § 35.151(a). Similarly, any existing facility or part of a facility that is altered after January 26, 1992 in "a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." *Id.* § 35.151(b) Newly constructed and altered facilities must comply with detailed accessibility standards. *See* 28 C.F.R. § 35.121(c).

For existing facilities, on the other hand, "[a] public entity shall operate each service, program, or activity so that *the service program, or activity, when viewed in its entirety*, is readily accessible to and usable by individuals with disabilities." *Id.* § 35.150(a). For present

purposes, there are two important distinctions between the requirements for new or altered facilities and the requirements for existing facilities. First, while new or altered facilities or parts of facilities must themselves be "readily accessible to or usable by" individuals with disabilities, public entities may bring existing facilities into compliance with Title II of the ADA by making the *programs or services* "readily accessible to or usable by" individuals with disabilities. *Id.* § 35.150(a). This is known as the "program access requirement" and does not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities." *Id.* § 35.150(a)(1); *see also* Title II Preamble, Pt. 35, App. A, at 492 (explaining that the program access requirement, which is lower than the Standards, continues to apply to existing facilities).

Second, the Title II regulations do not subject existing facilities to the accessibility standards designated for new constructed or altered facilities. Instead, the regulations provide several methods by which existing facilities may comply:

> A public entity may comply with the requirements of this section through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing faciliti es where other m ethods are effective in achieving compliance. A public entity, in making alterations to existing buildings, shall meet the accessibility requirements of § 35.151. In choosing among available methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, program s, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

*Id.* § 35.150(b).[5]  *See Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 6 (1st Cir. 2003) ("Title

---

[5] The regulation also creates exceptions were accommodations would require modifications that would threaten a property's historical significance or "[r]equire a public entity

II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entitles with the flexibility to choose how to make access available."). While the regulations allow for considerable flexibility, however, they make clear that an existing facility is not simply exempt from ADA compliance, and in fact may be required to alter existing buildings to meet the ADA standards if other methods of compliance are unavailable or ineffective. Thus, the central question in determining whether the plaintiffs have a reasonable likelihood of success on the merits on their claim that the Courthouse is currently in violation of the ADA comes down to whether the County has chosen methods that are effective in making court services, when viewed in their entirety, "readily accessible to or usable by" individuals with disabilities.

It is not so clear, however, what "readily accessible to or usable by individuals with disabilities" means in this context. The standard is frequently cited—it appears in the statutory text of both Titles I and III of the ADA, and frequently throughout the implementing regulations—yet rarely explained. *See* 42 U.S.C. § 12111(9)(A) (defining "reasonable accommodation") *and* § 12183(a)(1) (requirements for new construction and alterations in public accommodations and commercial facilities). The legislative history provides some insight into what Congress meant by the term in Title III of the ADA:

> The phrase "readily accessible to or usable by" is a term of art which, in slightly varied formulations, has been applied in the Architectural Barriers Act of 1968 ("ready access to, and use of") , the Fair Housing Act of 1968, as am ended ("readily accessible to and usable by"), and the regulations implementing section 504

---

to take an action that it can demonstrate would result in a fundamental alteration in the nature of a service, program or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(2)-(3). For the later exception, the head of the public entity or his designee must specify the reasons for concluding that the modifications qualify under the exception. The County does not seek to rely on either of these exceptions.

of the Rehabilitation Act of 1973 ("readily accessible to and usable by") and is included in standards used by Federal agencies and private industry, e.g., the Uniform Federal Accessibility Standards (UFAS) ( "ready access to and use of") and the American National Standard f or Buildings and Facilities—Providing Accessibility and Usability f or Physically Handicapped People (ANSI A117.1) (readily accessible to, and usable by).

 The term is intended to enable people with disabilities (including mobility, sensory, and cognitive impairments) to get to, enter and use a f acility. While the term does not necessarily require the accessibility of every part of every area of a facility, *the term contemplates a high degree of convenient accessibility*, entailing accessibility of parking areas, accessible routes to and from the facility, accessible entrances, usable bathrooms and water fountains, accessibility of public and common use areas, and access to the goods, services, programs, facilities, accommodations and work areas available at the facility.

Report of Committee on Education and Labor, H.R. Rep. 101-485, pt. 2, 117-18 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 400-01 (emphasis added); *accord* Report of Committee on the Judiciary, H.R. Rep. 101-485, pt. 3, 60, *reprinted in* 1990 U.S.C.C.A.N. 445, 483 ("Although it does not mean total accessibility in every part of every area of a facility, it does mean a high degree of convenient accessibility: for example, accessible routes to and throughout a facility, accessible entrances to buildings and spaces, usable bathrooms, water fountains and other features."). Though short on specifics, this legislative history suggests that Title II of the ADA sets the bar for accessibility considerably higher than the mere possibility of access.

 Perhaps a more useful place to look for guidance is the ADA accessibility standards for new and altered facilities. These spell out, in considerable detail, precisely what is required for a new or altered facility to meet the requirement that it be "readily accessible to or usable by" individuals with disabilities. *See* 28 C.F.R. § 35.151(c); Department of Justice, *2010 ADA Standards for Accessible Design* (2010) (incorporating 28 C.F.R. § 35.151 and the 2004 ADAAG standards). The regulations certainly do not require a public entity to conform every part of an existing facility to the standards applicable to new construction. *See id.* at 37 ("This

document does not address existing facilities unless altered at the discretion of a covered entity."). They do, however, provide valuable guidance regarding what the Department of Justice considers "readily accessible to or usable by individuals with disabilities," as several other Courts have noted. *See Flynn v. Doyle*, 672 F. Supp. 2d 858, 879-80 (E.D. Wis. 2009) ("[E]vidence regarding the alleged failure to meet the UFAS/ADAAG standards could still be relevant in the context of a 'program accessibility' case. A program could be rendered inaccessible if it is held in an inaccessible facility."); *Pascuiti v. New York Yankees*, 87 F. Supp. 2d 221, 226 (S.D.N.Y. 1999) ("[E]ven though only new construction and alterations must comply with the Standards, those Standards nevertheless provide valuable guidance for determining whether an existing facility contains architectural barriers. Thus, plaintiffs are allowed to compare facilities at the Stadium with the requirements laid out in the Standards as part of their effort to establish individual barriers to access.").[6]

In their post-hearing brief, the plaintiffs identify six barriers that render the courthouse and its services inaccessible to individuals with disabilities: (1) the restrooms for the public are not accessible; (2) the elevator at the Courthouse "is decrepit and dangerous"; (3) there are steps required to get to the witness stands; (4) there are steps required to get into the jury boxes; (5) the bathrooms in the jury deliberation rooms are not accessible; and (6) the counters used by the clerks are too high for a person in a wheelchair.[7] From this list, the Court can immediately strike

---

[6] *See also Brown v. County of Nassau*, 736 F. Supp. 2d 602, 617 (E.D.N.Y. 2010) ("[W]hile the ADAAG regulations clearly are not dispositive in this case, they can still provide guidance as to whether an existing facility is readily accessible and usable by individuals with disabilities." (citing *Flynn* and *Pascuiti*)); *Hanebrink v. Adams*, C.A. No.8:08-74-HMH, 2009 WL 3571539, at *4 (D.S.C. Oct. 26, 2009) (citing *Pascuiti*); *Access Now, Inc. v. S. Fla. Stadium Corp.*, 161 F.Supp.2d 1357, 1368 (S.D. Fla. 2001) (same).

[7] The plaintiffs have also previously questioned the accessibility of the ramps leading to the building, though this is not mentioned as a barrier in their post-trial brief. At the hearing,

the fourth and fifth items, which relate solely to the accessibility of facilities used only by jurors: as previously stated, none of the plaintiffs in this action have demonstrated an imminent prospect that they will be asked to serve as a juror at the Courthouse, and therefore they are not exposed to the imminent harm required to give them standing to sue over these alleged violations. *See Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ("To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical.").

As litigants in the Courthouse, however, the plaintiffs do have a very real interest in the accessibility of the courtrooms, including the witness stands, the restrooms, and the clerks' counters. On one hand, the Court doubts that the inaccessibility of the witness stands in the courtrooms is a significant barrier. The fact that a witness in a wheelchair must testify from somewhere other than the witness stand, while less than ideal, appears unlikely to deprive the plaintiffs of a meaningful opportunity to testify in their cases. Further, there is no evidence in the record that the height of the clerk's counter causes any meaningful barrier to access, or that the clerk's staff does not reasonably accommodate individuals in wheelchairs though other sufficiently effective means.

The accessibility of the restroom facilities, however, is a more substantial concern, when viewed as a whole. From the evidence presented, it appears that there are no public restrooms accessible to individuals in wheelchairs in the Courthouse itself, and there is no indication that

---

there was also testimony from architect John Werntz that the slope of the ramp leading from the accessible entry to the City-County Building to the elevator in the basement of the Courthouse meets applicable ADA guidelines. The parties spar over whether Mr. Werntz is an "expert witness" or whether his testimony can establish ADA compliance. The Court will leave those disputes for another day, however, and simply observe that regardless of the weight given to Mr. Werntz's testimony, the plaintiffs (who have the burden) have not produced any evidence that this ramp is not usable by individuals in wheelchairs or not ADA compliant.

the County accommodates individuals with disabilities by reassigning cases involving disabled parties, attorneys, witnesses, or spectators to fully accessible facilities elsewhere—though this seems to be the County's plan going forward, based on the testimony at the evidentiary hearing. Thus, it appears that the County's sole method of providing accessible restrooms to individuals with disabilities involves the route described at the hearing: an individual in a wheelchair must take an elevator (which is old, but the evidence does not appear to warrant the "decrepit and dangerous" label assigned by plaintiff) to the basement and from there travel a fair distance—between 30 and 50 yards according to Mr. Pawlak's recollection—down a ramp to the basement of the City-County building, then travel back up the ramp and the elevator to return to the courtroom. While there is no evidence that the elevator or the ramp are themselves inaccessible—or even that they do not conform to ADA specifications—it seems unusual that an individual whose mobility is limited by a disability should be required to travel significantly farther than an individual with no disability.

By way of comparison, if the Courthouse were newly constructed, *every* restroom would be required to meet ADA accessibility standards. *See* ADAAG Standard § 213.2 (2004). More relevantly, if the Courthouse were being altered and it was technically infeasible to make every restroom accessible, it could comply with the ADA regulations by providing a single unisex restroom "in the same area and on the same floor as existing inaccessible toilet or bathing rooms." *Id.* § 213.2(1). To reiterate, the Courthouse is not required to comply with the ADAAG standards if it employs other effective methods to make its services "readily accessible to or usable by" individuals with disabilities. *See* 28 C.F.R. § 35.150(b). But the discrepancy between the restroom facilities necessary to be considered "readily accessible to or usable by individuals with disabilities" in a new courthouse and the actual facilities provided in the Superior

Courthouse lends support to the plaintiffs' claim that the Courthouse is not readily accessible and that the County does not meet the program accessibility requirement when it provides court services in that facility.

Turning to the case law, other circuits that have addressed this issue have held that a courthouse's services are not "readily accessible to or usable by" individuals with disabilities if they are provided in a facility entirely lacking bathrooms accessible to individuals in wheelchairs. In *Shotz v. Cates*, 256 F.3d 1077, the plaintiffs alleged that the county courthouse had violated the ADA due to barriers including curb ramps twice the allowable slope and bathroom stalls with insufficient floor space. *Id.* at 1079. The district court dismissed the complaint, but the Eleventh Circuit reversed, holding that "[i]f the Courthouse's wheelchair ramps are so steep that they impede a disabled person or if its bathrooms are unfit for the use of a disabled person, then it cannot be said that the trial is 'readily accessible,' regardless whether the disabled person manages in some fashion to attend the trial." *Id.* at 1080. Similarly, in *Layton v. Elder*, 143 F.3d 469, 471 (8th Cir. 1998), the Eight Circuit upheld a mandatory injunction requiring a courthouse to comply with the ADA where the plaintiffs had established that "two flights of steps leading up to the courthouse were narrow, the wheelchair ramp was too steep, and the courthouse restrooms were not adequate to accommodate a wheelchair."

The Court need not decide here that the unusual distance to an accessible restroom actually violates Title II of the ADA: at this stage it would be enough for the Court to find that the plaintiffs have a reasonable likelihood of success in establishing that the Courthouse and court services are not "readily accessible to or usable by" individuals with disabilities as required by 28 C.F.R. § 353.150(a) and that the bathroom accommodations currently provided are not "effective in achieving compliance with [that] section." *Id.* § 35.150(b)(1). Although the degree

of likelihood of success is relevant when considering the balance of harms, "the threshold is low. It is enough that the plaintiff's chances are better than negligible." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). Based on the evidence before the Court, this is a close call. On the one hand, the barriers to access at the Courthouse in this case are not as severe as those condemned in *Shotz* and *Layton*. Individuals in wheelchairs do have access to an accessible restroom, albeit some distance away. And while it is technically in a different building, the tunnel between the Courthouse and the City-County building provides an (apparently ADA compliant) route of access without going outside. On the other hand, *Shotz* and *Layton* make clear that providing accessible restrooms is an essential aspect of making services or facilities readily accessible, and the Courthouse itself currently falls well short of what would be required to make the facility ADA compliant if the County made alterations, because there are no accessible restrooms in the same area as inaccessible restrooms near the courtrooms. Though the issue is very close, the Court concludes that there is at least some reasonable likelihood that the plaintiffs could establish to a jury that the lack of convenient accessible restrooms near other inaccessible restrooms renders the Courthouse less than readily accessible.

As noted above, just how likely the plaintiffs are to succeed on the merits is an important question that in many cases will affect the balancing of harms. *See Abbott Labs.*, 971 F.2d at 12; *Roland Mach. Co.*, 749 F.2d at 387 ("The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor. This is a most important principle, and one well supported by cases in this and other circuits, and by scholarly commentary."). In this case, however, the playing field does not tilt noticeably in either direction. Whether or not the County has failed to reasonably accommodate the plaintiffs as required by Title II of the ADA is a question for the jury. *See Dadian v. Village*

*of Wilmette*, 268 F.3d 831, 837 (7th Cir. 2001). This matter is not before the Court on summary judgment. But based on the evidence presented in support of the motion for preliminary injunction, reasonable people (and thus reasonable jurors) could disagree on whether the inconvenient restroom access renders the Courthouse and its services, as a whole, less than readily accessible. Therefore, while the Court concludes that the plaintiffs have established some reasonable likelihood of success on the merits, it cannot say that they are so likely to succeed that it outweighs the balance of harms, as discussed below.[8]

### B.      Adequate Remedy at Law and Irreparable Harm

Because the preliminary injunction analysis requires a balancing of the plaintiffs' and defendants' harms, it is important to identify not only whether there is irreparable harm but to specify what that harm is. Compare, for example, the case of a criminal defendant without legs who must choose between the ignominy of being carried up the courthouse steps or being arrested for failing to appear at a hearing in his criminal case, *see Tennessee v. Lane*, 541 U.S. 509 (2004), with the case of a litigant or attorney who must make a relatively arduous journey to another building simply to use the bathroom. In both cases, there is harm and in both cases there may be a violation of Title II of the ADA. But the two harms are not equal, and whether a preliminary injunction should issue in each case depends on the seriousness of the irreparable harm.

During the evidentiary hearing, the Court asked plaintiffs' counsel to identify what irreparable harm any of the plaintiffs would suffer if the preliminary injunction did not issue. In

---

[8]Having found that the plaintiffs have satisfied their showing on the merits, and noting little dispute regarding the manner of travel between buildings, the Court finds it unnecessary to personally inspect the Courthouse, as requested by plaintiffs. *See* DE 125.

their post-trial brief, the plaintiffs claim that they have "no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied" because: "The present plaintiffs seek access to a courthouse for their trials and court proceedings. The monetary "value" of that access is also difficult to calculate." DE 124 at 16. As the plaintiffs' own evidence establishes, however, "access to a courthouse" in this instance does not mean literal, physical access to the St. Joseph Superior Court, but rather the removal of barriers that create unnecessary inconveniences for individuals with disabilities that others do not have to bear. With that said, the Court agrees that the harm that the plaintiffs may suffer in having to endure the alleged ADA violations is not readily susceptible to a numerical monetary value. The ADA gives certain rights to individuals with disabilities, and any award of damages at the end of trial may be nominal or at best "seriously deficient as a remedy for the harm suffered." *Roland Machinery*, 749 F.2d at 387–88.

### C.    Balance of Harms

The motion for a preliminary injunction fails at the third step of the analysis. In considering a request for a preliminary injunction, the district court must choose the course of action that will minimize the cost of being mistaken. *See Am. Hosp. Supply v. Hosp. Prod., Ltd.*, 780 F.2d 589, 593 (7th Cir. 1985). Given the substantial cost to the County of being forced to undertake expensive and potentially unnecessary renovations, the plaintiffs have not established that the irreparable harm they would suffer between now and the end of this litigation outweighs the harm the County would suffer if it ultimately prevails.

To assess the harm that the County might suffer, it is necessary to examine the possibilities for a preliminary injunction that the plaintiffs have proposed. Ultimately, the plaintiffs are seeking an injunction that will require the County to make the Courthouse "readily

accessible" to individuals with disabilities. The injunctive relief they request at this preliminary stage, however, has been a moving target. In their initial motion for preliminary injunction, they requested "that defendants be required to remedy architectural barriers which obstruct the use of the Courthouse by individuals with disabilities," and "that no proceedings in the Courthouse against any plaintiff named in this action . . . be permitted to proceed in a manner which violates Title II of the [ADA]." DE 82 at 1. During the hearing, plaintiffs' counsel attempted to reformulate the request as a prohibitive, rather than mandatory, injunction, perhaps in response to the County's objection that a mandatory injunction ordering compliance with the ADA was not appropriate at the preliminary injunction stage. The plaintiffs asked that the County be generally prohibited from spending money on anything else until the Courthouse was brought into compliance with the ADA, though they asked for the opportunity to spell out the precise contours of their request in their post-hearing briefs. *See* DE 123.

In their post-hearing brief, it appears, the plaintiffs have abandoned the idea of a specific request limiting the funds that the County may spend on non-ADA compliance matters, and instead request a preliminary injunction "requiring the county to cease its violations of Title II of the ADA and prohibiting the county from refusing to implement structural or other changes necessary to bring the St. Joseph County Courthouse at 101 S. Main St., South Bend, IN into compliance with Title II; [and] establishing a schedule for compliance." DE 124 at 18. In their reply brief, the plaintiffs add specifics to their request, asking for an order stating the specific ways in which the County Courthouse in South Bend does not provide meaningful access to individuals with disabilities, finding that this lack of access violates Title II of the ADA and that the County has not developed a transition plan for the courthouse; and requiring the County defendants to submit a plan for corrective action.

Without unduly minimizing the irreparable harm that plaintiffs may suffer in the form of inconvenience attending hearings or conducting other business in the Courthouse, the Court finds that harm to be substantially outweighed by the harm that the County may suffer if the preliminary injunction is granted and the County is either affirmatively required to make certain structural changes to the Courthouse or prohibited from spending money on other essential functions or repairs until a final judgment in this case. The plaintiffs argue that the County will suffer no harm if its simply required to comply with the ADA and remove impermissible barriers to access, but this misses the point of the harm a defendant may suffer from a preliminary injunction. What the Court must consider is "harm that would not be either cured by the defendant's untimely prevailing in the trial on the merits or fully compensated by the injunction bond that Rule 65(c) of the Federal Rules of Civil Procedure requires . . . ." *Roland Machinery*, 749 F.2d at 387.

The plaintiffs concededly do not have the means to post the security that would be required to compensate the County for the substantial expenses it would incur in complying with the required preliminary injunction. *See* Fed. R. Civ. P. 65(c). This fact alone creates an impediment to granting the preliminary injunction, and the Court does not believe that the circumstances of this case—in terms of the certainty of success on the merits or the magnitude of harm to the plaintiffs—warrants an exceptional waiver of the required security.[9] But even if the

---

[9]Despite the seemingly ironclad language, the security required by Rule 65(c) is not absolute and admits of exception in limited circumstances, such as where there is no danger that the defendant will suffer damages or when a bond giving a defendant absolute surety would exceed the applicant's ability to pay and the district court finds that the relative costs to the applicant of having to do without a desperately needed preliminary injunction outweigh the risk to the opponent of a smaller bond. *Habitat Educ. Ctr. v. U.S. Forest Service*, 607 F.3d 453, 458 (7th Cir. 2010). *See also Cronin v. U.S. Dept. of Agric.*, 919 F.2d 439, 445 (7th Cir. 1990) ("Rule 65(c) of the Federal Rules of Civil Procedure . . . makes such security mandatory, although a

plaintiffs could post such a security, the County's harm would be virtually irremediable if it were required to make permanent structural changes that it may not otherwise have made if it ultimately prevails on the merits. For these reasons, the Court finds that the balance of harms favors denying the plaintiffs' motion for a preliminary injunction.[10]

A final note on procedure: it appears that what the plaintiffs are really seeking with their motion for preliminary injunction is a final judgment in their favor and a permanent, mandatory injunction. If they prevail on the merits of their claim and establish that there are impermissible barriers—based on the discussion above, their best chance will likely involve the availability of accessible bathrooms in the Courthouse proper—they may well be entitled to the order and injunction they seek. This is not appropriate at the preliminary injunction stage: the essence of a preliminary injunction is to grant interim relief from significant irreparable harm based on the *likelihood* of success on the merits, not to provide a ruling that the plaintiffs have prevailed. If such a final ruling were appropriate, there would be no need for a *preliminary* injunction at all. But procedure matters, and the Federal Rules of Civil Procedure are not optional.

---

number of environmental decisions . . . , waive the requirement or allow the posting of a nominal bond."); *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988) ("While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory."). For the reasons discussed above, however inconvenient the current conditions are, the plaintiffs do not desperately need this preliminary injunction. Moreover, the harm to the County would be substantial if it prevails in the end.

[10]Having found the balance of harms favors the County, the Court does not consider the final element of the preliminary injunction analysis. In any event, an analysis would be closely tied to the merits and unlikely to affect the result one way or another: if the plaintiffs' claims are correct, the public interest would certainly favor enforcing Title II of the ADA; if the plaintiffs' claims fail, however, the public interest in St. Joseph County would be harmed in that the County would have spent considerable sums unnecessarily.

**Conclusion**

For the reasons discussed above, the Court **DENIES** the Plaintiffs' Motion for

Preliminary Injunction [DE 82]. Further, the Motion to Inspect the St. Joseph County Courthouse

[DE 125] is **DISMISSED** as moot.

      SO ORDERED.

      ENTERED:   March 4, 2013

 

                        /s/ JON E. DEGUILIO
                    Judge
                    United States District Court